JOHN KING'S ADM'R. v. THOMAS CASSIDY'S ADM'R.

1. K., being the assignee and holder of certain incumbrances upon and interests in real estate claimed by C., covenanted with C. that in case the latter should pay off the incumbrances within two years, then he, K., would convey the property to C., his heirs or assigns; and further stipulated that if the incumbrances should remain unpaid at the expiration of the two years, then he would sell the property and apply its proceeds to their liquidation, and would pay over to C., his heirs or assigns, any surplus which might remain of the proceeds after payment of the incumbrances and all expenses. C. died within the two years, having made no payment on the incumbrances; and his administrator sued K. for the property and for an account of rents, etc. K. never authenticated and presented the incumbrances to C.'s administrator for allowance against C.'s estate, but set them up in defense to the suit brought against him by the administrator. *Held*, that this line of defense was competent, notwithstanding the omission of K. to probate and present the incumbrances to the administrator. The interest of K. was a vested interest, and to hold it to be defeasible by the requirements of our probate laws, would be to place on those laws a construction which would bring them in conflict with Section 10th Article 1 of the United States Constitution, which prohibits legislation impairing the obligation of contracts. The reasoning of this court to the same effect in Dwight v. Overton, 35 Texas, 390, and Donley & Anderson v. Cundiff, Ib. 741, is referred to with approval; while the apparently contrary ruling of Robertson v. Paul, 16 Texas, 472, is disapproved.

2. Article 1310, Paschal's Digest, which prohibits suit against an executor or administrator on a claim for money, unless the claim, properly authenticated, has been presented, etc., can apply only to such money demands as can be reduced to reasonable certainty, enabling the holder to verify them by oath. If the claim be of such a nature that it cannot be verified with a reasonable degree of certainty, the holder can sue the administrator without regard to the requirements of Article 1310. (Merle *v.* Andrews, 4 Texas, 214, cited by the court.)

3. The general rule that executors and administrators are bound to plead limitation, does not obtain when that defense would operate to defeat rights of the estate against third parties.

APPEAL from Travis. Tried below before the Hon. J. P. Richardson.

The opinion discloses the character of this case, and states the material facts.

*Hancock & West,* and *Moore & Shelley,* for the appellant.

*W. Alexander,* for the appellee.

WALKER, J. Thomas Cassidy in his lifetime appears to have been the owner of the north half of lot 4, and the south half of lot 5, in block 70, in the city of Austin, as well as lots 1 and 2 in block 7, in Fort Smith, Arkansas; and on the 1st day of December, 1856, under an arrangement with John King, an agreement which is set out in the record appears to have been entered into between the parties, but is signed only by King, and reads as follows:

" This memorandum witnesseth: That whereas I, John " King, of the city of Fort Smith, in the State of Arkansas, " have become the assignee of Francis Dieterich and James " Raymond, of a deed of trust executed by Thomas Cassidy " and wife to the said Raymond for the benefit of said Diete- " rich, and to secure him in the advancement of certain sums " of money therein mentioned and set forth; and whereas said " deed of trust secured to the said Dieterich the sum of thirty- " five hundred and seventy-three dollars; and whereas I have

" paid the said Dieterich twenty-five hundred and seventy-three
" dollars for said Cassidy, and given my note at one day for
" thirteen hundred dollars, to secure the payment of the re-
" maining one thousand dollars, thereby satisfying said deed
" of trust; said trust being upon and embracing the south
" half of lot No. 4, in block No. 70, in the city of Austin;
" and said lot having been sold at sheriff's sale, under execu-
" tion, and purchased by Henry W. Sublett, or the equity of
" redemption therein being sold, I have purchased of the said
" Henry Sublett his right, title, and interest in and to the same.
" And whereas I have purchased of George Hancock his right,
" title, and interest in and to the north half of lot No. 4,
" in block No. 70, in the city of Austin, for which I have
" executed a note to said Hancock for five hundred dol-
" lars, due at six months, with twelve per cent. interest, and
" have also taken from John Horan a deed to the said last
" above-mentioned half lot, and executed to him my note for
" twelve hundred and sixty-eight dollars, due at twenty-four
" months, with ten per cent. interest from date, and dated No-
" vember 22d, 1856 ; and whereas the said Cassidy is indebted
" to Ben. T. Duval in the sum of five hundred and twenty-
" seven dollars and ninety cents, secured by note, dated October
" 1st, 1856, bearing ten per cent. interest, and to Duval and
" King in the sum of three thousand and fifty-three dollars and
" seventy-three cents, secured by note or writing obligatory,
" bearing date October 1st, 1856 ;

" Now this witnesseth, that if, at the expiration of two
" years from this date, the said indebtedness to Ben. T. Duval,
" and to Duval & King, be paid, and the said indebtedness
" to Hancock, Dieterich, and Horan be all paid, then I will
" and hereby bind myself, to convey all my right, title, and
" interest in and to the said two half lots or parcels of ground,
" above-mentioned, to the said Thomas Cassidy, his heirs or
" assigns.   But if, at the end of two years from the 1st day of
" November, 1856, the said several amounts above-mentioned
" remain due and unpaid, or any part thereof remain unpaid,

" then I am to sell said above described lots to the best ad-
" vantage, and apply the proceeds to the payment of said sev-
" eral amounts, or so much thereof as may remain unpaid ; and
" after paying said liabilities, if there be anything remaining of
" the proceeds of said property, I am to pay it over to the said
" Cassidy, his heirs or assigns, after deducting all necessary ex-
" penses incurred by me in the premises.   And if at any time
" between now and the expiration of two years, the said Cassidy
" can contract a sale of said property which he may consider
" advantageous, and for an amount sufficient to pay off all the
" above described liabilities, then and in that case I will recon-
" vey said property, or so much of the same as he may have
" contracted the sale of to whomsoever he may direct.

     " And whereas the said Cassidy and wife have this day
" conveyed to me the certain lots in the city of Fort Smith,
" Arkansas, known as lots Nos. 1 and 2 in block No. 7, or the
" equity of redemption therein, for the nominal consideration
" of twelve hundred dollars, now this memorandum witnesseth
" that I am to sell the same to the best advantage, and appro-
" priate whatever I may receive, over and above the incum-
" brance thereon, towards the payment of the above men-
" tioned liabilities, and account to Cassidy, his heirs or assigns,
" therefor. .

"RECAPITULATION.

" Note to Ben. T. Duval.................$   527 90
" Note to Duval & King............... 3,053 75
" Note to Dieterich.................... 1,300 00
" Note to John Horan.................. 1,268 00
" Note to George Hancock.............   500 00


     " In testimony whereof I have hereunto set my hand and seal,
" this 1st day of December, A.D., 1856, at the city of Austin,
" Texas.
                                       " JOHN KING. [L.S.]
" Witness—JOHN B. COSTA,
          " F. DIETERICH."

After this, in May, 1858, as appears from the answer of King, which was admitted to state the matter correctly, King and Cassidy had an accounting as to the Fort Smith property, and made a final settlement.   This account was as follows:

Thomas Cassidy,
                                      To John King, Dr.

| | | |
|---|---|---|
| Dec. — 1856—Note, this date, - - - - | $ 500 | 00 |
| Oct. 10, 1856—Amount paid M. Henry Estate, - | 3,879 | 50 |
| May 11, 1858—Interest on $3,879.50, to date, - | 226 | 90 |
| Dec. — 1856—Cash of T. J. Chambers, - - | 50 | 00 |
| Feb. — 1858—Amount paid James Brown, - - | 213 | 50 |
| " " Amount paid John Gordon, - - | 36 | 00 |
| " " Amount paid Joseph Bonefours, - | 20 | 00 |
| | | |
| | $4,925 | 90 |

CR. by Real Estate in the city of Fort Smith,
    Arkansas, Lots one and two (1 & 2) in Block
    seven (B. 7), - - - - - - - 5,000 00

                                    $   74 10

Settled in full (signed duplicate),
                                    JOHN KING,
                                    THOS. CASSIDY.

This account was had about May, 1858, after the agreement was made.   Its validity was never disputed.

It is natural to suppose that this instrument of writing sets forth the true relation which the parties established between themselves.   It is called a memorandum; and if we consult this memorandum it appears that King had purchased from Cassidy his right to redeem the lots in Austin, one of which had been sold to Henry W. Sublett, and the other to George Hancock and John Horan.

There appears to be no controversy about the Fort Smith property, and we deem it unnecessary to take further notice of it in this opinion.

By the judgment of the District Court King's right to the

Austin property is treated as a mortgage; and Cassidy having died before the expiration of two years from the execution of the paper, dated December 1st, 1856, the District Court sustained the demurrer and special exceptions to King's answer, upon the ground that King only held the property in security to himself for those debts of Cassidy which he had paid or had assumed to pay, and that these debts never had been presented to Cassidy's administrator for allowance, nor approved by the probate court, and that by Cassidy's death King's power to sell was revoked, and that the property must pass under the control of the probate court. And, indeed, the probate court, as in the case of Dwight v. Overton, had treated the north half of Lot 4 as assets of the estate, and set it apart to Mrs. Cassidy, the widow.

There would seem to be some confusion, either in the mind of the judge in forming his opinion, or in the manner in which the record presents it; but it seems sufficiently clear that the case never was presented to a jury, but went off on a demurrer.

It is clearly inferable from the instrument of December 1st, 1856, that the title to the Austin property had already passed from Cassidy at the date of that instrument. The south half of Lot 5 was held by Raymond, but it also seems to have been sold to Sublett, and King derived his title through Raymond and Sublett, whilst Horan and Hancock held the title to the north half of No. 4, and King derived his title to it through them. Let us see, then, from the position of the parties toward each other, what were their legal and equitable rights. It can hardly be claimed that Cassidy in his lifetime could have set up title to the property. His interest had been divested, but under his contract with King he had an equity in the proceeds of the sale. King also bound himself to make deeds for the property within two years from the date of his obligation, in pursuance of any sale which Cassidy himself might effect, but Cassidy died within less than two years, having made no sale.

We think it would be going even beyond the rule laid down in Robertson v. Paul, 16 Texas, to say that under this state of

facts, the property, having passed through so many hands, could possibly revert to Cassidy's estate, upon his demise.

We think, however, that the rule as laid down in Donley & Anderson *v.* Cundiff, and Dwight *v.* Overton must apply in this case. The utmost that can be claimed for the rule in Robertson *v.* Paul is, that where the deceased had owned property in his lifetime, but had so conveyed it that a trust or an equity remained in him at the time of his death, that then the property must revert to the estate, and be governed by the laws regulating the estates of deceased persons.

But we do not think this the proper construction of our probate law, and we can only reiterate the reasons for so thinking which we gave in Dwight *v.* Overton. (35 Texas, 390.) The interest of an assignee who takes an assignment for a specific use is a vested interest, and cannot be divested by the operation of any law which would not be at antagonism with the 10th Section of the 1st Article of the Constitution of the United States; and it matters not whether it be a probate law, dependent for its force upon the death of one of the parties to the contract, or any other law, it would be to all intents and purposes a law impairing the obligation of contracts, and therefore repugnant to the Constitution of the United States.

We think that under the contract between King and Cassidy, Cassidy's administrator succeeded to no other right, upon Cassidy's death, than that held by his intestate.

The judgment of the court upon the demurrer was erroneous. Neither Cassidy nor his administrator could set up any interest in the property, or the fund arising from the sale of the property, until the debts enumerated in the contract of December 1st, 1856, were fully satisfied. If, when this had been done, a surplus remained in King's hands, it would pass to Cassidy, or his administrator, as assets; and there can be but little doubt, if any, but that after the expiration of two years, Cassidy's administrator could have compelled King to sell the property, and discharge the specific debts named in the contract. The holders of these claims were creditors of Cassidy, who stood in

the light of beneficiaries to a trust, and under the arrangement between Cassidy and King, they had a right to compel King to dispose of the property to pay their debts, and that right could not be divested by the death of either of the parties.

And now we will suppose that King out of his own funds had paid these debts. We do not think Cassidy or his administrator could, after the expiration of two years, disturb King's title to the property, without payment of the debts specified, out of his, Cassidy's, funds. But if, as seems to have been claimed, Cassidy had paid the debts himself within the two years, equity would no doubt have compelled King to reconvey the property to him, notwithstanding it appears that King had suffered the south half of Lot No. 5 to be sold to a *bona fide* purchaser, without notice of the contract between himself and Cassidy. The title of such a purchaser could not be disturbed if he purchased without notice, but King could be made to account for the value of the property.

It is difficult for us to see how his honor the district judge could have considered the property purchased by Swenson as assets of Cassidy's estate, when there is no pretense but that there was a recorded title in King, and a sale to Swenson for a *bona fide* consideration, without notice of any equitable claim in Cassidy against the property.

It is perhaps proper for us to say that Article 1310 Paschal's Digest can only refer to such money claims as can be reduced to reasonable certainty, enabling the holder to verify them by oath; but where the accounts are of such a nature that they cannot be verified with reasonable certainty, a party holding such claim may bring his suit, and call upon the administrator for an account. This rule is distinctly laid down in Merle *v.* Andrews, 4 Texas, 214.

As a general rule, it is the duty of executors and administrators to plead the statutes of limitation, wherever the defense lies, against all claims presented for allowance by the estates which they represent. But this rule is by no means inflexible, and the court should not allow an administrator to make such a

defense where its manifest operation would be to cut off the rights of the estate against third parties; and this case furnishes an apt illustration. Cassidy had parted with his title to the property in question, before his death. The title had passed to strangers. King, with Cassidy's consent, bought in the titles. Now, Cassidy has no right to disturb King's title except by the contract of December 1st, 1856. By this contract King agrees, virtually, that if the property can be sold, within two years, for more money than is necessary to pay the specified debts, then, whatever net overplus there may be shall belong to Cassidy. It is, then, to the interest of Cassidy that the debt shall be paid, as this is a prerequisite to his deriving any benefit from the overplus, if there should be one, from the sale of the property.

We think, in this case, King, having assumed Cassidy's debts, in consideration of the property conveyed to him, had no other security against Cassidy than the property itself; whilst Cassidy had an interest only in the residue of the proceeds of the property after the payment of the debts. It was, then, to the interest of Cassidy, mainly, that the debts should be paid, as he could have no interest in the fund antecedent to their payment.

We have examined the cases referred to in the appellant's brief, and under the authorities we are clearly of opinion that King was not bound to present his claims to Cassidy's administrator for allowance.

The judgment of the District Court must be reversed, and an account being taken, the District Court will adjust the equities of the parties in accordance with this opinion; and should it be found that the account stands in King's favor, the north half of Lot No. 4, in block 70, must be sold to pay it; and if the proceeds of sale should exceed the amount due to King, the overplus should be paid to Cassidy's administrator. The title to the south half of Lot 5, sold under the deed of trust to Swenson, passed to the purchaser, and cannot be disturbed.

Reversed and remanded.